# United States District Court

## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| FAHEEM BADY SASSIN, | |
| PLAINTIFF, | Civil Action No. 4:21-cv-804 |
| VS. | |
| PACIFIC LIFE INSURANCE COMPANY, | JURY TRIAL |
| DEFENDANT. | |

### CLASS ACTION COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT

1.      COMES NOW Plaintiff, Faheem Bady Sassin (hereinafter "Sassin"), acting by and through his attorneys, and files this action on behalf of Sassin and other variable annuity contract holders who purchased their contracts from Pacific Life Insurance Company (hereinafter "PAC LIFE" or "Defendant").  Plaintiff asserts that PAC LIFE  improperly charged all variable annuity contract holders with respect to what are called "surrender charges" in connection with administration of variable annuity contracts issued by PAC LIFE. In so doing, PAC LIFE has breached the contracts it has made with each contract holder, acting uniformly in violation of the terms and conditions of its variable annuity contracts.

### NATURE OF THE ACTION

2.      Plaintiff is an individual who resides in Carrollton, Texas and works at 555 Republic Drive, Plano, Collin County, Texas.  On August 18, 2021 Sassin made an excess partial withdrawal in the amount of ten thousand dollars (10,000.00) from his Pacific Choice variable annuity issued on January 24, 2020 by PAC LIFE identified as contract number VM20433803.  As a result of the

excess partial withdrawal, which was subject to a seven percent (7%) surrender charge penalty, Sassin suffered a surrender charge in the amount of Seven Hundred Fifty-Two and 69/100 ("752.69") Dollars.  Plaintiff alleges that the calculation by PAC LIFE of such surrender charge is in excess of the proper amount that should have been charged under the terms and conditions of the contract. As a result, Sassin has been damaged, not only by the amount of the improper charge, but by the reduction in contractual benefits that is a collateral consequence of the improper charge.

3.     Defendant Pacific Life Insurance Company is a stock life insurance company and is the company that issued the variable annuity contract to Plaintiff.[1] PAC LIFE is licensed to do business in the State of Texas and may be served through Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

## JURISDICTION AND VENUE

4.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332. This Court has personal jurisdiction over Defendant because Defendant is doing business in the State of Texas and is licensed in Texas. Furthermore, the aggregate amount in controversy for this class action exceeds $5,000,000, and, on information and belief, less than one-third of all Class Members reside in the State of Texas. *See* Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332 and 1711.

---

[1]     Variable annuities are a hybrid insurance and investment product.  The investment component consists of units of interest in a separate account that are registered as securities under the Securities Act of 1933.  The separate account is registered as an investment company for purposes of the Investment Company Act of 1940 (ICA).  The insurance components of variable annuities consist of an annuity insurance contract issued by a state-regulated insurance company, and interests in one or more fixed accounts that invest in the general account of a state-regulated insurance company.

5.     This Court has supplemental jurisdiction over the subject matter of any Texas common law and/or statutory claims pursuant to 28 U.S.C. §1367.  Such claims form part of the same case or controversy under Article III of the United States Constitution.

6.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because PAC LIFE has agents and transacts business here. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred here.

PARTIES

**A.     PLAINTIFF**

7.     Plaintiff is the owner of the variable annuity issued by PAC LIFE.  Sassin is a citizen and resident of Carrollton, Texas. Sassin made a withdrawal of $10,000.00 from his PAC LIFE variable annuity on August 18, 2021, which withdrawal was subject to a seven percent (7%) surrender charge penalty.  Such excess partial withdrawal caused Sassin to incur surrender charges in the amount of Seven Hundred Fifty-Two and 69/100 (752.69) Dollars.  Plaintiff has standing to bring this action as he was caused to suffer a concrete injury in that the calculated penalty charged by PAC LIFE for the withdrawal was in an amount that violated the terms and provisions of his variable annuity contract.

**B.     DEFENDANT**

8.     Defendant PAC LIFE is organized as an insurance company under the laws of the state of Nebraska and maintains its principal place of business and headquarters at 700 Newport Center Drive,  Newport Beach, California 92660.  Defendant PAC LIFE is licensed to transact insurance in the state of Texas.  PAC LIFE has assets under management of approximately $171 billion according to its 2019 annual report . PAC LIFE specializes, in part, by selling retirement income and savings products geared primarily toward retirees, with the majority of its products

being variable annuities.  The Texas Department of Insurance has approved PAC LIFE variable annuity products, such as Sassin's Pacific Choice annuity, for sale in the state of Texas. PAC LIFE sells variable annuity products around the country, including to residents in the Sherman Division of the Eastern District of Texas.

## FACTUAL BACKGROUND

9.    Plaintiff brings this Nationwide class-action and a Texas statewide class-action on behalf of himself and other similarly situated variable annuity purchasers to halt and remedy the harm caused by Defendant's systematic breach of its contract provisions in connection with the calculation of surrender charges.

10.    Defendant markets and sells its variable annuity products on a national basis primarily through its network of individual sales agents, marketing organizations, third party marketing organizations ("TPMOs"), brokerage firms and financial institutions. Defendant uses four principal distribution channels to effectuate the sale of its variable annuities, which include independent broker/dealers, regional broker/dealers, financial institutions and individual sales agents (collectively referred to herein as "Affiliated Agents").

11.    Defendant prepares, disseminates and approves standardized information, account service forms, brochures, illustrations, marketing and sales materials to Affiliated Agents for effectuating the sale of variable annuities to customers, many of whom are senior citizens. Defendant markets its variable annuity products primarily to older Americans and senior citizens in the Eastern District of Texas and nationwide.

### C.    The Structure of PAC LIFE's Variable Annuities

12.    Annuities are complex products that contain a number of different parts that have differing effects and results depending on performance and decisions made by the purchaser. The

deferred annuity can be broken down into two types, either a fixed or variable annuity. The basic difference is that fixed annuity premiums grow at a guaranteed fixed interest rate, whereas variable annuity premiums are invested in equity portfolios that fluctuate in value, thus being variable.

13.    The fixed annuity purchaser receives from the insurer an interest rate on the amount of premiums paid into the deferred fixed annuity, very similar to a debt instrument.

14.    The variable annuity purchaser experiences fluctuations in value since premiums are invested in equity portfolios.  These equity portfolios are called "sub-accounts" and consist of shares which are purchased with the annuity premium.  These shares are called "units" and represent the investment in the sub-account.  Every sub-account has a share price, or "unit price", which is used to determine the value of the sub-account, which fluctuates daily depending on the performance of the sub-account.  The annuity purchaser has the choice to invest in one or more sub-accounts of an overall separate account sponsored by the insurer, and contains many different investment vehicles similar to mutual funds which are managed by mainstream, third-party professional investment managers.

15.    A variable annuity is granted tax deferred status from the United States Internal Revenue Code regardless if the annuity purchase is made with IRA (qualified) funds or after-tax (nonqualified) funds. Nonqualified annuity investment gain is tax deferred until withdrawn, in which case the withdrawal of gain over the original cost basis is taxed at the contract owner's ordinary income tax rates in effect at the time of withdrawal.  A qualified annuity is treated the same as other similar IRA investments in terms of tax deferral and taxation of withdrawals.

16.    The variable annuities sold by PAC LIFE contain various components with different characteristics.  The separate accounts, which contain sub-accounts that each hold a portfolio of stocks or bonds or other investments, are federally regulated, and (if no exemption applies) the

interests in the separate accounts available under the variable annuity contracts are registered as securities and sold pursuant to federal security laws.

17.     Variable annuities sold by Defendant can be purchased with optional benefits called "living benefit riders" and "death benefit riders" for an extra cost.  A living benefit is designed to provide an insurance benefit while the contract owner is living and generally consists of a "benefit base" from which the living benefit is determined.  A death benefit is designed to provide an insurance benefit when the contract owner dies and generally consists of a "benefit base" from which the death benefit is determined.

18.     A variable annuity product is selected, optional benefits chosen, and then applied for via a paper application.  Once the premium (purchase payment) is accepted by PAC LIFE, a contract is delivered to the annuity purchaser.  The contract contains the terms and provisions of how the annuity will work, describes the fees, and the various features of the annuity.  The contract also contains the terms and provisions of how the optional living benefit rider and death benefit rider will work, describes the fees for those optional benefits, and the various features of those benefits.  The contract is either accepted or rejected by the annuity purchaser.  The contract can be rejected by the annuity purchaser within the "free look period", which is typically 10 to 30 days depending on the state in which the annuity was purchased, wherein the annuity purchaser returns the contract to the issuer and receives a refund.

### D.    Surrender Charges

19.     Costs and fees are important to the performance of a variable annuity contract. Surrender charges are a very important component of variable annuity policies and a source of significant revenue to issuers like PAC LIFE.  The SEC has published guidelines for consumers that

highlight the importance of these charges and the impact that they can have on the value of the

purchaser's contract:

> You will pay several charges when you invest in a variable annuity. Be sure you understand all the charges before you invest. **These charges will reduce the value of your account and the return on your investment.** Often, they will include the following:
>
> **Surrender charges** – If you withdraw money from a variable annuity within a certain period after a purchase payment (typically within six to eight years, but sometimes as long as ten years), the insurance company usually will assess a "surrender" charge, which is a type of sales charge. This charge is used to pay your financial professional a commission for selling the variable annuity to you. Generally, the surrender charge is a percentage of the amount withdrawn, and declines gradually over a period of several years, known as the "**surrender period**." For example, a 7% charge might apply in the first year after a purchase payment, 6% in the second year, 5% in the third year, and so on until the eighth year, when the surrender charge no longer applies. Often, contracts will allow you to withdraw part of your account value each year – 10% or 15% of your account value, for example – without paying a surrender charge.
>
> **Example:** You purchase a variable annuity contract with a $10,000 purchase payment. The contract has a schedule of surrender charges, beginning with a 7% charge in the first year, and declining by 1% each year. In addition, you are allowed to withdraw 10% of your contract value each year free of surrender charges. In the first year, you decide to withdraw $5,000, or one-half of your contract value of $10,000 (assuming that your contract value has not increased or decreased because of investment performance). In this case, you could withdraw $1,000 (10% of contract value) free of surrender charges, but you would pay a surrender charge of 7%, or $280, on the other $4,000 withdrawn.

See https://www.sec.gov/investor/pubs/varannty.htm

20.    PAC LIFE earns very substantial and growing amounts from the surrender charges

paid by its contract holders.

21.    Given the astounding level of the variable annuity sales to elderly individuals, one

would think that charges, which are assessed by PAC LIFE against the savings of retirees and other

variable annuity contract holders, would be scrupulously fair. In fact, however, that is not the case.

Instead, PAC LIFE is assessing excess charges as a matter of uniform application of its methodology

and breaching the terms of its contract as to all contract holders who incur such charges.

## DEFENDANT'S BREACH OF CONTRACT

**E.    The Contract Language Specifying Calculation of the Withdrawal Charge**

22.    By virtue of the methodology employed, PAC LIFE is not only assessing a withdrawal charge on the withdrawal amount, but is actually **assessing a withdrawal charge on the withdrawal charge**. By doing so, PAC LIFE violates the plain language of the contract that it has written, and acts contrary to the explanation and example put forth by the SEC for the benefit of consumers. Such improper conduct should be prohibited and all past and current contract holders should be compensated for the excess withdrawal charges that have been imposed.

23.    The calculation of withdrawal charges is governed by the contracts issued by PAC LIFE, which contracts are based upon only a few specific contract forms. On information and belief, PAC LIFE interprets all of these contract forms in the same way and uses uniform language with respect to its calculation of withdrawal charges. PAC LIFE contracts contain provisions for calculating and deducting Withdrawal Charges.

24.    The contract specifies the **exact** Withdrawal Charge Percent to be used for calculating Withdrawal Charges: "Withdrawals from the Contract Value are subject to a withdrawal charge which is shown in the Contract Specifications." ICC1210-1252 p.3B

Withdrawal Charges (Contingent Deferred Sales Charges) [2]

_____

[2]

For example, the plaintiff's contract ICC12:10-1252 specifies a declining Withdrawal Charge Percent per year corresponding to the age of the Purchase Payment being withdrawn. The Withdrawal Charge Percentages for the plaintiff's contract decline by year starting at 7%, then 7%, then 6%, then 5%, then 3%, and finally 0% when the age of purchase payment fully matures in its sixth Contract Year. Any withdrawal of Purchase Payment prior to that sixth Contract Year would trigger a Withdrawal Charge calculation utilizing the Withdrawal Charge Percent corresponding to the age of that particular purchase payment as measured in Contract Years.

| Age of Purchase Payment in Contract Years[1] | Withdrawal Charge Percent |
|---|---|
| 1 | 7% |
| 2 | 7% |
| 3 | 6% |
| 4 | 5% |
| 5 | 3% |
| 6 and Later | 0% |

25.     PAC LIFE breaches their contract by applying a Withdrawal Charge Percentage greater than that which is specified in the Contracts. Through the practice of *Grossing Up* and *Netting Down* (described in detail later), Defendant is able to collect a Withdrawal Charge using a Withdrawal Charge Percent that is greater than contractually allowed[3].

26.     The contract further specifies that only withdrawals which the policyholder has requested can trigger the specific Withdrawal Charge calculations:

> "When *you* [Contract Owner] withdraw an amount, the "age" of any Purchase Payment *you* withdraw determines the level of withdrawal charge as shown in the Contract Specifications." ICC12:10-1252 p.14

> "You may…withdraw all or a portion of the amount available under this Contract, while the Owner, or Annuitant in the case of a Non-Natural Owner, is living and the Contract is in force... You may specify that the withdrawal be taken from specific Investment Option(s)… Withdrawals will normally be effective as of the end of the Business Day of the withdrawal request, in a form satisfactory to us, is received at our Service Center" ICC12:10-1252 p.17

27.     PAC LIFE breaches their contract by treating *their* deduction of the Withdrawal Charge as part of the policyholder's withdrawal request. The Contract requires Withdrawal Charges

---

[3]

Plaintiff suffered a 7.53% Withdrawal Charge Percent instead of the contractual 7% as specified on the contract specifications page. Class-wide, defendant will generally use the formula WC%/(1-WC%) in order to arrive at the Withdrawal Charge Percent in breach of their Contracts.

to be calculated based on the Owner's withdrawal request and whether that requested amount would represent a withdrawal of Purchase Payments. However, Defendant *Grosses Up* the withdrawal request using a sum-of-infinite series formula[4] into a new and modified "withdrawal request". Defendant will then apply the normal Withdrawal Charge Percentage shown on the contract specification page to the new larger "withdrawal request" which results in an overcharge.  Both the withdrawal request <u>and the Withdrawal Charge itself</u> become subject to Withdrawal Charge calculations.  (Emphasis supplied).

28.    Defendant "grosses- up" the withdrawal request by applying a sum-of-infinite series formula which enables the withdrawal-charge-upon-withdrawal-charge to occur seamlessly and without notice. Defendant causes the entire  amount  of the "grossed-up" withdrawal to be subject  to  the  stated Withdrawal Charge Percentage and deceptively makes the entire method appear contractual. Defendant is contractually bound to only calculate withdrawal charges based on the Owner's withdrawal request and not their own modified *grossed up* withdrawal request.

29.    PAC LIFE breaches their contract by deducting Withdrawal Charges from the Owner's check instead of making the deduction from the Owner's  Contract Value. The contract specifies that Withdrawal Charges must be deducted from the Contract Value:

---

[4]

Using the plaintiff's 7% Withdrawal Charge Percentage, PACIFIC LIFE will divide the Withdrawal Charge Percentage by one minus the Withdrawal Charge Percentage: 7% / (1-7%) = 7.526882%. This is not the stated 7% as shown on the Contract Specifications page. This is the sum-of-an-infinite-series formula. This modified Withdrawal Percentage is applied to the requested Withdrawal amount in order to arrive at the Grossed Up withdrawal amount, e.g., 10,000 x 7.526882% = 10,752.69 as the "grossed-up" withdrawal amount. Then, defendant will apply the 7% to this new larger and modified "withdrawal request" in order to back into their desired Withdrawal Charge of 752.69 because 10,752.69 x 7% = 752.69. Contractually, the Withdrawal Charge should have been 700.00, or 10,000 x 7%. Defendants breach of contract results in an overcharge of 52.69.

"We debit the Subaccount [Value][5] with Subaccount Units as a result of any withdrawals, including any applicable withdrawal charges" ICC12:10-1252 p.11

"The withdrawal charge will be deducted proportionately from each Investment Option[6] selected for withdrawal." ICC12:10-1252 p.14

30.     In the case of Netting Down the withdrawal request, Defendant will withhold the Withdrawal Charge from the Owner's check in breach of their contractual requirement to deduct the Withdrawal Charge from the Contract Value. The practice of Netting Down results in the same sum-of-infinite-series overcharge scheme where the amount actually received by the Owner was subject to a Withdrawal Charge Percentage greater than found on the Contract Specifications page[7]. Ultimately, even in the case of the Grossed Up withdrawal request, the Withdrawal Charge is still withheld from the check and not deducted from the Contract Value as is required contractually.

31.     The Contract requires a specific calculation resulting in specific withdrawals of Purchase Payments and using specific Withdrawal Charge Percentages resulting in a Withdrawal

---

[5]

The Subaccount Value is a part of the Contract Value, albeit through convoluted contract language. The Contract specifies on this same page that Contract Value is comprised of Variable Account Value which itself is comprised of Subaccount Values. In the end, the Contract specifies that Withdrawal Charges are ultimately required to be deducted from the Contract Value as deductions of Subaccount Units.

[6]

An Investment Option is defined as: "A Variable Account offered under the Contract." ICC12:10-1252 p.5. As stated previously, a Variable Account is part of the Contract Value: "As of the end of any Business Day, the Contract Value is equal to the sum of the Variable Account Value plus any Loan Account Value." ICC12:10-1252 p.5.

[7]

For example, had the plaintiff requested 10,000 as a "gross" amount, defendant would have deducted 700 from the check and plaintiff received 9,300.  Defendant will have considered 9,300 as the "netted down" withdrawal request and 700 as the calculated Withdrawal Charge. Looking closely at the math, 700 / 9,300 equals the same 7.526882% and still results in the same overcharge percentage. Defendant will have still calculated Withdrawal Charges on Withdrawal Charges, albeit under different mechanical schemes.

SASSIN CLASS ACTION COMPLAINT                                            PAGE  11

Charge which must be deducted from the Contract Value. The withdrawal request cannot be "grossed-up" or "netted-down" in complete contravention of the proper and contractual application of Withdrawal Charge Percentages and Withdrawal Charge collection. Instead, PAC LIFE applies a "gross and net" methodology to create a façade that Withdrawal Charges are being calculated and collected contractually. In reality, these mechanisms ensure that Withdrawal Charges will be subject to their own Withdrawal Charges.

### F.    PAC LIFE's Improper Extra-Contractual Application of Grossing and Netting

32.    The above-referenced contract language is a complete description of the contractual Withdrawal Charge calculation provisions that should be applied by PAC LIFE. What PAC LIFE does in practice, however, is to perform one additional step in front of the contractual sequence or at the back of the contractual sequence depending on the method elected by the forms processor at PAC LIFE.  PAC LIFE will modify the requested withdrawal amount in one of two ways depending on which programmed method the forms processor chooses in PAC LIFE's policy administration system.  The two methods are called "grossing up" the requested withdrawal and "netting down" the requested withdrawal.

33.    **"Grossing up:"**  PAC LIFE will "gross up" the requested withdrawal by formulae and simply charge the respective Withdrawal Charge on the larger "grossed up" withdrawal amount instead of the actual amount requested.  By modifying the requested withdrawal amount internally, the contract owner receives the expected amount in cash as per the service form. PAC LIFE breaches its contract language by then dividing the excess withdrawal amount by the formulae (amount of withdrawal subject to penalty divided by 1 - the applicable penalty percentage) resulting in the contract owner suffering a larger surrender charge than contractually owed.  In this way, PAC

LIFE is able to use the sum-of-an-infinite series calculation to charge surrender charges on surrender charges themselves.

34.    **"Netting Down:"**    Alternatively, PAC LIFE will "net down" the requested withdrawal by formulae after calculating the Withdrawal Charge on the entire requested withdrawal amount. PAC LIFE breaches its contract language by simply deducting the entire surrender charge from the contract owner's check which forces surrender charges themselves to become subject to their own surrender charges. PAC LIFE is required to issue the contract owner a check equal to the requested withdrawal amount and deduct the Withdrawal Charge from the remaining Contract Value Instead, PAC LIFE deducts surrender charges from the requested withdrawal amount, contractually disallowed, which ensures that surrender charges themselves are subject to their own surrender charges.

## CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiff brings this action individually and on behalf of all similarly situated persons as the Court may determine to be appropriate for class certification treatment, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b). Plaintiff seeks to represent a nationwide class and a Texas statewide class.

### The Nationwide Surrender Charge Class

36.    The proposed Nationwide Surrender Charge Class for Surrender Charges is  defined as follows:

> All persons, other than resident citizens of the state of Texas, who, within the applicable statute of limitations, purchased a variable annuity product from PAC Life Insurance Company or its affiliates, and incurred a withdrawal charge during their ownership of such product ("Nationwide Surrender Charge Class");

37.    The Nationwide Surrender Charge Class is reasonably estimated to be in the thousands or tens of thousands and is thus so numerous that joinder of all its members is impracticable. The precise number of class members and their addresses are unknown to Plaintiff, but can be ascertained through Defendant's records. Class Members may be notified of the pendency of this action by mailing, publication or other notice.

38.    There is a well-defined community of interest in the relevant questions of law and fact affecting the putative Nationwide Surrender Charge Class members concerning the breaches of contract and the uniform application of surrender charges in violation of the policy and contract provisions.

39.    Common questions of law and fact predominate over any individual questions affecting Nationwide Surrender Charge Class members, including, but not limited to, the following:

(i)    Whether Defendant violated the provisions of the variable annuity contracts in the way in which it assessed surrender charges;

(ii)    Whether Defendant is liable for the excess surrender charges that it has imposed;

(iii)    Whether Defendant has harmed the members of the class in connection with living benefits;

(iv)    Whether Defendant has harmed members of the class in connection with death benefits;

(v)    Whether Plaintiff and members of the Nationwide Surrender Charge Class have sustained damages; and

(vi)    Whether Plaintiff and the Nationwide Surrender Charge Class are entitled to damages.

40.    Common questions of law and fact predominate over any individual questions affecting Class members, including, but not limited to, the specific amount of damages that each Plaintiff or class member has suffered.

41.    With respect to the  putative class, Plaintiff's claim is typical of those of the absent class members. If brought and prosecuted individually, the claims of each class member would require proof of many of the same material and substantive facts, rely upon the same remedial theories and seek the same relief.

42.    Plaintiff will fairly and adequately protect the interests of the classes and have no interests adverse to or that directly and irrevocably conflict with the interests of other class members.

43.    Plaintiff is willing and prepared to serve the Court and the putative classes in a representative capacity with all of the obligations and duties material thereto.

44.    Plaintiff has retained the services of counsel who are experienced in complex class action litigation. Plaintiff's counsel will adequately prosecute this action, and will otherwise assert, protect and fairly and adequately represent Plaintiff and all absent class members.

45.    Class certification is appropriate under F.R.C. P. 23(b)(1), in that the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the parties opposing the class. Such incompatible standards of conduct and varying adjudications on the same essential facts, proof and legal theories would also create and allow the existence of inconsistent and incompatible rights within the classes.

46.    Class certification is appropriate under F.R.C.P. 23(b)(3), in that common questions of law and fact predominate over any questions affecting only individual class members.

47.    Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

**SASSIN CLASS ACTION COMPLAINT**                                           **PAGE  15**

a)    individual claims by the class members would be impracticable as the costs of pursuit would far exceed what any one class member has at stake;

b)    little individual litigation has been commenced over these controversies alleged in this Complaint, and individual class members are unlikely to have an interest in separately prosecuting and controlling individual actions;

c)    the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

d)    the proposed class action is manageable.

48.    Excluded from the Class are Defendant, Defendant's officers and directors, those persons' immediate families, and the successors and predecessors of any such excluded person or entity.

**The Texas Statewide Surrender Charge Class**

49.    The proposed Texas Statewide Surrender Charge Class is defined as follows:

All persons residing in the state of Texas, who, within the applicable statute of limitations, purchased a variable annuity product from PAC LIFE or its affiliates, and incurred a withdrawal charge during their ownership of such product (the "Texas Statewide Surrender Charge Class").

50.    The Texas Statewide Surrender Charge Class is reasonably estimated to be in the thousands or tens of thousands and is thus so numerous that joinder of all its members is impracticable. The precise number of class members and their addresses are unknown to Plaintiff, but can be ascertained through Defendant's records. Class Members may be notified of the pendency of this action by mailing, publication or other notice.

51.    There is a well-defined community of interest in the relevant questions of law and fact affecting the claims of Plaintiff and the putative Texas Statewide Surrender Charge Class members concerning the breaches of contract and the uniform application of surrender charges in violation of the policy and contract provisions.

SASSIN CLASS ACTION COMPLAINT                                                      PAGE  16

52.    Common questions of law and fact predominate over any individual questions affecting Plaintiff and the Texas Statewide Surrender Charge Class members, including, but not limited to, the following:

(i)    Whether Defendant violated the provisions of the variable annuity contracts in the way in which it assessed surrender charges;

(ii)    Whether Defendant is liable for the excess surrender charges that it has imposed;

(iii)    Whether Defendant has harmed the members of the class in connection with living benefits;

(iv)    Whether Defendant has harmed members of the class in connection with death benefits;

(v)    Whether Plaintiff and members of the Texas Statewide Surrender Charge Class have sustained damages; and

(vi)    Whether Plaintiff and the Texas Statewide Surrender Charge Class are entitled to damages.

53.    Common questions of law and fact predominate over any individual questions affecting Class members, including, but not limited to, the specific amount of damages that Plaintiff or any class member has suffered.

54.    With respect to each putative class, Plaintiff's claim is typical of those of the absent class members. If brought and prosecuted individually, the claims of each class member would require proof of many of the same material and substantive facts, rely upon the same remedial theories and seek the same relief.

55.    Plaintiff will fairly and adequately protect the interests of the class and have no interests adverse to, or that directly and irrevocably conflict with, the interests of other class members.

56.     Plaintiff is willing and prepared to serve the Court and the putative class in a representative capacity with all of the obligations and duties material thereto.

57.     Plaintiff has retained the services of counsel who are experienced in complex class action litigation. Plaintiff's counsel will adequately prosecute this action, and will otherwise assert, protect and fairly and adequately represent Plaintiff and all absent class members.

58.     Class certification is appropriate under F.R.C. P. 23(b)(1), in that the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the parties opposing the class. Such incompatible standards of conduct and varying adjudications on the same essential facts, proof and legal theories would also create and allow the existence of inconsistent and incompatible rights within the classes.

59.     Class certification is appropriate under F.R.C.P. 23(b)(3), in that common questions of law and fact predominate over any questions affecting only individual class members.

60.     Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

a)     individual claims by the class members would be impracticable as the costs of pursuit would far exceed what any one class member has at stake;

b)     little individual litigation has been commenced over these controversies alleged in this Complaint, and individual class members are unlikely to have an interest in separately prosecuting and controlling individual actions;

c)     the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

d)     the proposed class action is manageable.

61.     Excluded from the Class are Defendant, Defendant's officers and directors, those persons' immediate families, and the successors and predecessors of any such excluded person or entity.

## COUNT ONE
## Breach of Contract

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     PAC LIFE's assessment of surrender charges was done consistently and uniformly in a manner contrary to the terms and conditions of the applicable contracts and policies. In particular, PAC LIFE's assessment of a surrender charge on a surrender charge was a violation of the variable annuity contracts issued by PAC LIFE. PAC LIFE has breached Plaintiff's contract by deducting Withdrawal Charges from the Owner's check instead of making the deduction from the Owner's  Contract Value. The contract specifies that Withdrawal Charges must be deducted from the Contract Value. PAC LIFE breaches its contracts in their process of either "grossing up" or "netting down" - all of which results in the deduction of the surrender charge from the contract owner's check instead of as a deduction from the Owner's contract value.   Such violations of the variable annuity contracts were done intentionally or recklessly.

64.     All conditions precedent to the liability or obligations of PAC LIFE have occurred or have been waived.

65.     Plaintiff and each member of the Statewide Surrender Charge Class have suffered damages in an amount to be determined. Plaintiff alleges that the total damages to the Texas Statewide Surrender Charge Class exceed the sum of five million dollars ($5,000,000).

**<u>Plaintiffs' Demand for Jury Trial</u>**

66.     Plaintiff hereby demands a trial by jury.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays for relief and judgment as follows:

1.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

2.     Awarding damages to the class in the amount of improper surrender charges paid by Plaintiff and the members of the Class;

3.     Awarding compensatory damages in favor of Plaintiff and the other Class members against PAC LIFE for all damages sustained as a result of Defendant's wrongdoing, in amounts to be proven at trial, including pre-judgment interest thereon;

4.     Awarding Plaintiff his reasonable costs and expenses incurred in this action, including counsel fees and expert fees as may be authorized by law; and

5.     Such other and further relief as the Court may deem just and proper.

                                Respectfully submitted:

                                /s/  Lewis T. LeClair
                                Lewis T. LeClair, lead attorney
                                Texas State Bar No. 12072500
                                lleclair@mckoolsmith.com
                                **MCKOOL SMITH, P.C.**
                                300 Crescent Court Suite 1500
                                Dallas, TX 75201
                                Telephone: (214) 978-4000
                                Telecopier: (214) 978-4044


                                Gary D. Corley
                                Texas State Bar No. 04823800
                                garycorley@gcorleylaw.com
                                Jared T. Elk

Texas State Bar No. 24114494
jared@gcorleylaw.com
**CORLEY LAW FIRM**
108 North Travis Street
Sherman, Texas 75090
Telephone: (903) 892-1048
Telecopier: (214) 260-4925

**ATTORNEYS FOR FAHEEM BADY SASSIN, PLAINTIFF**